# UNITED STATES DISTRICT COURT
# DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: Federal-Mogul Global, Inc. | : | Hon. Joseph H. Rodriguez |
| PepsiAmericas, Inc., n/k/a Pepsi-Cola Metropolitan, Bottling Company, Inc., | : : : | Civil Action Nos. 10-cv-986 & 11-cv-813 |
| Appellant, | : | **OPINION & ORDER** |
| v. | : | |
| Federal-Mogul Global Inc., et al., | : | |
| Debtor-Appellee. | : | |

This matter comes before the Court on appeal from the Bankruptcy Court's October 27, 2010 grant of summary judgment in favor of Debtor-Appellee. The Court heard oral argument on October 17, 2013. For reasons stated that day, as well as reasons discussed below, the decision by the Bankruptcy Court is affirmed.

Before the Bankruptcy Court was a motion for summary judgment on the amended proof of claim of PepsiAmericas, Inc. ("Appellant"), filed in the bankruptcy of Federal-Mogul Global, Inc. ("Appellee"), against two of Appellee's subsidiaries, Federal-Mogul Corporation ("FMC") and Federal-Mogul Products, Inc. ("FMP"). Appellant had alleged that Appellee improperly billed shared insurance policies, giving rise to claims based on tort, conversion, and breach of the implied covenant good faith and fair dealing. The Appellee argued that no factual basis existed to substantiate the validity of Appellant's claims. The Bankruptcy Court agreed and granted summary judgment in favor of Appellee.

## Background

This dispute derives from both parties' relationship with the former Abex Corporation, a producer of brakes and other friction products that spawned countless cases of asbestos exposure. See In Re Federal-Mogul Global, Inc., 438 B.R. 787, 800 (Bankr. D. Del. 2010). The assets and liabilities of Abex Corporation were divided and sold through several mergers and acquisitions resulting Appellant and Appellee, among others, owning a portion. See In Re Federal-Mogul Global Inc., 438 B.R. at 793. That is,

1

along with owning assets from Abex Corporation, both parties owned liabilities from asbestos-related litigation filed against Abex. Id. Both Appellant and Appellee collected proceeds from Comprehensive General Liability Insurance Policies which insured against those asbestos claims. However, Abex Corporation was not the only source of Appellee's asbestos-related liability, as it owned six other streams of such asbestos liability. See In Re Federal-Mogul Global Inc., 2007 WL 4180545, at *13-15 (Bankr. D. Del. Nov. 16, 2007). Appellant has argued that Appellee improperly collected insurance proceeds from the shared Comprehensive General Liability plans to compensate for cases deriving from its six non-Abex streams of liability, and as a result benefited from the insurance policies without indemnifying Appellant for litigation costs and expenses.

The history of the corporate relationship between the two parties is long, muddled, and thoroughly documented. This Court approves and affirms the corporate histories explained in detail in past opinions. See In Re Federal-Mogul Global Inc., 438 B.R. at 792-94; In re Federal-Mogul Global, Inc., 411 B.R. 148, 160-162 and Appendix A (Bankr. D. Del. 2008); In re Federal-Mogul Global Inc., 2007 WL 4180545, *13-15. The relevant corporate history is repeated here.

In 1968, Abex Corporation was acquired by IC Industries, Inc., predecessor to Whitman Corporation and ultimately PepsiAmericas, Inc. ("Appellant"). See In Re Federal-Mogul Global, Inc., 438 B.R. at 792-93. In 1984, IC Industries also acquired Pneumo Corporation, which it renamed Pneumo Abex Corporation ("PAC 1") in 1985. Id. at 793.

In 1988, IC Industries sold Abex Corporation and PAC 1 stock to PA Holdings Corporation, which was owned by Henley Investment Inc., a subsidiary of The Henley Group, pursuant to the 1988 Stock Purchase Agreement ("1988 SPA") in the record. Id.[1] The 1988 SPA between IC Industries and PA Holdings Corporation was amended on August 29, 1988. In 1990, the assets and liabilities of Abex Corporation and PAC 1 were consolidated into their parent, PA Holdings. Id. By the time the second amendment to

---

[1] The 1988 SPA contains a provision explicitly barring third party beneficiaries. See 1988 SPA at ¶ 15 ("this Agreement is for the sole benefit of the parties hereto and nothing herein expressed or implied shall give or be construed to give to any person or entity, other than the parties hereto, any legal or equitable rights hereunder.").

2

the 1988 SPA was executed on September 23, 1991, IC Industries had changed its name to Whitman Corporation.  Id.  Additionally, PA Holdings had undergone a name change to become another Pneumo Abex Corporation ("PAC 2").  As such, the Pneumo Abex Corporation that signed the Second Amendment to the 1988 Stock Purchase Agreement, PAC 2 formerly PA Holdings, was not the entity acquired by IC Industries in 1984.  Id. The original 1988 SPA and its two amendments are referred to collectively as "the Whitman Agreements."  Id. at 790.

In 1992, Henley Investments Inc., which owned PAC 2, changed its name to Abex Inc.  Id. at 793.  That same year, The Henley Group distributed Abex Inc. stock to its common stockholders, and transferred certain of its own assets and liabilities to PAC 2. Id. at 793 and Appendix A.

In 1994, PAC 2 sold certain assets of Abex Corporation to Wagner Electric Corporation, predecessor to FMP, pursuant to the 1994 Asset Purchase Agreement ("1994 APA") in the record.  Id.  Under that agreement, Wagner agreed to indemnify PAC 2 with respect to certain liabilities.[2]

A Mutual Guaranty Agreement between Abex Inc., parent of PAC 2, and Cooper Industries, Inc., Wagner's parent, was executed on December 30, 1994, with respect to the 1994 APA.  See id.  In the Mutual Guaranty, Abex Inc. and Cooper guaranteed, as direct obligors and not as sureties, to each other and to each other's subsidiaries (the parties to the 1994 APA) "absolutely and unconditionally . . . the full and prompt payment when and as due of all amounts payable under the [APA] by such Guarantor's subsidiary which is a party to the [APA] and the full and prompt performance by such Guarantor's subsidiary which is a party to the [APA] of all its undertakings and obligations under the [APA]."  Section 1.  There was also an insurance agreement

---

[2] Under Section 2.3 of the 1994 APA, Wagner agreed that it would "assume and become liable for, and shall pay, perform and discharge as and when due all of the Assumed Liabilities."  Section 2.3 defines Assumed Liabilities, excluding "Retained Liabilities" which are defined in Section 2.4.  That section defines Retained Liabilities to include "all liabilities and obligations of Seller to Whitman under the Whitman Agreements." Section 2.4(g).  Thus, Debtor FMP, successor to Wagner, agreed to indemnify PAC 2 only for the Assumed Liabilities.  The Retained Liabilities stayed with what is now PAC 2. Section 13.3 of the 1994 APA provides that there is to be no third party beneficiary.

executed between PAC 2 and Wagner on December 30, 1994 in connection with the 1994 APA. Id. at 791.

In 1996, Wagner merged into Moog Automotive, Inc., another subsidiary of Cooper Industries, Inc. Id. at 794. Under a Purchase and Sale Agreement between Cooper and FMC, dated August 17, 1998 ("1998 P & SA"), Cooper sold its automotive products business, which included Moog, to FMC. Pursuant to the 1998 P & SA, FMC assumed Cooper's mutual guaranty obligations related to the 1994 APA for "the operation of and products manufactured or sold by the Wagner industrial brake business including" those liabilities related to asbestos in the brakes. Id. See also 1998 P & SA at Section 5.12(b), referring to Section 5.12(a)(x). Following the 1998 P & SA, Moog changed its name to Federal Mogul Products, Inc. ("FMP"). Id. at 792. FMP, therefore, was the successor to Wagner's indemnity obligation under the 1994 APA. Id. Appendix B. Thus, an asbestos-related claim arising out of the Moog friction products division received by PAC 2, a distinct entity, would have been subject to the assumed liabilities under the 1994 APA and indemnified by FMP. Id. That is, FMP undertook Wagner's obligations and FMC guaranteed FMP's performance. Id. at 794.

Beside these facts, this Court adopts the Bankruptcy Court's factual determination that Abex Corporation (not Abex Inc.), IC Industries, Whitman, Pneumo Corporation, and PAC 1 were, at one time or another, in the Appellant's corporate chain. Id. at 789. Similarly, Wagner Electric Corporation and Moog Automotive, Inc., were in the FMC/FMP corporate chain. Id. PA Holdings, The Henley Group, Abex Inc. and PAC 2 are entirely distinct entities from the corporate chains of Appellant and Appellee. Id.

Appellant has offered two groups of insurance policies that covered against Abex asbestos litigation. First, Appellant is the purchaser and first named insured for Comprehensive General Liability insurance policies purchased during the period of 1971-1985 to provide liability insurance coverage for Appellant and most of its then existing subsidiaries ("Appellant Policies"). Second, Appellant also has contractual rights to the proceeds paid from CGL insurance policies purchased by Abex Corporation prior to 1971 (herein "Pre-1971 Policies"). Appellee has never been named insured under the Appellant Policies or Pre-1971 Policies. Under the terms of the 1994 Asset Purchase Agreement, FMP claimed proceeds from the Appellant Policies and Pre-1971

Policies to compensate asbestos claims against portions of the "friction products" business of Abex Corporation. Those policies contained aggregate limits to certain categories of claims, and once those limits were reached, benefits would no longer be paid.[3]

Essentially, Appellant alleged that Appellee inequitably allocated expenses to the Appellant Policies and the Pre-1971 Policies, and received proceeds from those policies to which it was not equitably or lawfully entitled. Appellant's Amended Claim cited four examples of such alleged overbilling, which account for $1,400,000 in benefits from the Pre-1971 Policies and Appellant Policies. Upon seeing the bills sent to the Appellant Policies and Pre-1971 Policies, Appellant requested information from Pneumo Abex to justify the expenditures. Outside counsel for Appellant also made requests to outside counsel for Appellee. No information was provided. An independent investigation revealed that, in at least one of the cases, the named plaintiff did not work with Abex products. Despite this, Appellee allegedly received benefits from the shared insurance plans designed to cover Abex claims. Appellant argues these four instances are proof of a larger scheme to bill the Pre-1971 Policies and Appellant Policies for claims not covered under the Policies.

In addition to the Pre-1971 Policies, the Appellant Policies, the 1988 SPA, and the 1994 APA, Appellant provided the Court with three separate insurance settlement contracts signed by both Appellant and Appellee. Appellant claims that these contracts establish privity between it and Appellee, and that Appellee breached the implied covenant of good faith and fair dealing in these contracts by billing the Policies for non-Abex claims. The settlement contracts provided by Appellant are described as follows.

The December 28, 2006 Settlement Agreement between the co-claimants and Equitas Escrow Account lists as claimants Appellant, Appellee, two other entities, and

---

[3] The Bankruptcy Court noted three other insurance agreements not mentioned in the pleadings which Appellant filed under seal with leave of court. The three agreements under seal are (1) May 2000 Confidential Settlement Agreement between Pneumo Abex Corporation and Whitman Corporation, (2) December 2002 Final Settlement Agreement Between Pneumo Abex Corporation and Maryland Casualty Company, and (3) December 2006 Confidential Settlement Agreement and Release between Pneumo Abex LLC, Cooper Industries, Appellant, FMP, FMC and Certain Underwriters at Lloyd's.

all entities that have a present ownership interest in those entities, as well as predecessors, successors, or assigns. It was meant to settle two insurance coverage actions, <u>Certain Underwriters at Lloyds, London, et al. v. Pneumo Abex Corporation, et al.</u> and <u>Whitman Insurance Corporation, Ltd. v. Travelers Indemnity Company, et al.</u> The policies in question, known as the "London Policies," are defined by the contract. Also included in the contract is a statistical breakdown of the percentages of the settlement to which each entity was entitled. Appellant was entitled to 14.24% of the settlement and Appellee was entitled to 3.31% of the settlement.

The May 17, 2001 Settlement Agreement between Pneumo Abex Corporation and All State Insurance Company was signed by Appellant and Appellee. The various relevant policies issued by All State Insurance Company are named and identified. No percentage breakdown is provided.

A December 6, 2005 Settlement Agreement between Stonewall Insurance Company and multiple claimants including Appellant and Appellee identifies two policies that released funds pursuant to the agreement. The settlement agreement did not address the allocation of any of the funds provided by Stonewall.

In short, the Bankruptcy Court found that, because of the severance of the corporate relationships, Appellant's remedies, if any, are not against the Debtors in this case. 438 B.R. at 796.

> Under Section 8.3 PAC 2 agreed to retain certain liabilities under the Whitman Agreements "forever." . . . PAC 2 has the right either to perform remedial actions it is liable for under the agreement or to have Wagner (FMP) perform the work in which case PAC 2 will reimburse FMP, but Whitman ([Appellant]) nonetheless retained the right to control the details of the work or to perform the remediation. *See* Section 8.4(c) at 84. Section 8.5 recites limitations on PAC 2's environmental indemnification obligation. Wagner (FMP) agreed not to take any action it knew would result in [PAC 2] violating the Whitman Agreements in any way. Section 8.5(d). Even if Wagner (FMP) did so, it is PAC 2, not [Appellant], that would have recourse against Wagner. If there is a breach, [Appellant]'s remedies are with respect to PAC 2 to the exclusion of Wagner (FMP).

438 B.R. at 796-97 (citing 1994 APA).

## Appeal of Bankruptcy Court Decision

This Court has jurisdiction to hear an appeal from the bankruptcy court pursuant to 28 U.S.C. § 158(a). In undertaking a review of the issues on appeal, a district court reviews conclusions of law de novo, findings of fact on a clearly erroneous standard, and exercises of discretion for abuse thereof. See Official Comm. Of Unsecured Creditors v. Am. Classic Voyages Co., 405 F.3d 127, 130 (3d Cir. 2005). With mixed questions of law and fact, the court must accept the bankruptcy court's "finding of historical or narrative facts unless clearly erroneous, but exercise[s] 'plenary review of the [bankruptcy] court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.'" Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635, 642 (3d Cir. 1991). The district court's appellate responsibilities are further informed by the directive of the United States Court of Appeals for the Third Circuit, which effectively reviews on a de novo basis bankruptcy court opinions. In re Hechinger, 298 F.3d 219, 224 (3d Cir. 2002); In re Telegroup, 281 F.3d 133, 136 (3d Cir. 2002).

## Summary Judgment Standard

A court will grant a motion for summary judgment if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317 (1986)); accord Fed. R. Civ. P. 56 (c). Thus, this Court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. See Anderson, 477 U.S. at 256-57. Indeed, the plain language of Fed. R. Civ. P. 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See Celotex, 477 U.S. at 322.

Appellant argues against the traditional summary judgment standard of review, in favor of a lighter burden for the non-moving party. Appellant contrasts the instant case from Celotex by arguing that the lack of discovery warrants this lighter burden. (See Appellant Reply Br., p. 6.) As the Appellant notes, the Court in Celotex held that the non-moving party's interests were protected because there was discovery prior to the summary judgment motion, alleviating any concerns that the non-movants were being "railroaded" by summary judgment. See Celotex, 477 U.S. at 526. Pointing to the lack of any discovery in the underlying case, Appellant claims that Appellee filed "essentially a Rule 12(b)(6) motion" with the Bankruptcy Court, that Appellee should be required to establish "complete legal insufficiency of PepsiAmericas claims" while conceding the truth of Appellant's factual assertions. See Appellant Reply Br., p. 6-7. In short, Appellant requests that the underlying motion for summary judgment be reviewed as a motion to dismiss and adjudged by a Fed. R. Civ. P. 12(b)(6) standard. See Fed. R. Civ. P. 12(b)(6); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). In Celotex, however, the Court instructs that any fear of being "railroaded" can be alleviated through Fed. R. Civ. P. 56(f), which "allows the motion for summary judgment to be denied, or the hearing on the motion to be continued, if the non-moving party has not had an opportunity to make full discovery." See Celotex, 477 U.S. at 326 (citing Fed. R. Civ. P. 56(f)). Appellant did not request relief under 56(f).

## Analysis

This Court affirms the Bankruptcy Court's decision that the undisputed facts alleged by Appellant do not give rise to any liability on the part of Appellant. As the Bankruptcy Court noted, "there is a difference between what the facts are and what they mean and [Appellant's] challenge is to the meaning of undisputed facts." 438 B.R. at 789.

Although Appellant claimed "[t]ort, conversion, and breach of good faith and fair dealing regarding insurance policies," the Bankruptcy Court found that "the claims do not even identify the alleged tort (except conversion), do not explain how the policies were (allegedly) converted, or set forth the basis for any supposed duty of good faith or fair dealing owed by the Debtors to [Appellant]." 438 B.R. at 788. Indeed, Appellant agrees that FMP was not a party to the 1988 SPA, but asserts "common law obligations." Id. at 789. Appellant also agrees that neither it nor any of its predecessors was a party to the 1994 APA or 1998 P & SA. Id. Nonetheless, Appellant re-argues that Debtors are liable for "over-billing" shared insurance policies that it purchased to cover asbestos-related liabilities created by Abex Corporation, because Debtors' claims actually were not covered by the Abex policies but arose from six other "streams" of asbestos-related liability. In doing so, Appellant contends that the Bankruptcy Court failed to consider alternative avenues of privity between the Appellant and Appellee, namely through the doctrines of contract adoption, equitable estoppel with regard to the 1988 SPA, equitable estoppel of the shared insurance policies, and direct privity through the insurance settlement agreements that both Appellant and Appellee signed.

Debtors were not parties to the 1988 APA, the Pre-1971 Insurance Policies, or the Appellant Insurance Policies, but Appellant argues that Appellee is bound by those documents through the doctrine of contract adoption. Third parties to a contract become parties who are bound by the contract's terms by either explicitly or implicitly adopting the agreement. See American Legacy Foundation v. Lorillard Tobacco Co., 831 A.2d 335, 343 (Del. Ch. 2003). The contract itself, however, must contemplate that third parties might adopt it. Id. at 344. Whether the contract itself contemplates adoption is a question of contract interpretation. Id. Courts look to the language of the

contract to determine whether the original signatories intended adoption. See id. at 344-45.

There are no magic words to explicitly adopt a contract. Id. at 348. Statements made by a non-signatory confirming that it is bound by a contract can establish that it has adopted the contract. Id. at 349. Express adoption occurs in a variety of contexts. Id. Express adoption occurs when a successor adopts a contract of a predecessor as its own. Id. It also occurs when an agent acts on behalf of the principal and the principal agrees to be bound by the agent. Id. Any statement made by a third party confirming that it is bound by a contract is sufficient to adopt the agreement. Id.

Third parties can also implicitly adopt a contract through their conduct, rather than explicitly through their words. Implicit adoption occurs when a party accepts benefits intended for third party beneficiary. Id. Courts will often find implicit adoption when a party who has received benefits of a contract then tries to avoid burdens imposed by the same contract. Id.

Appellant has not identified any provisions or contractual language in the 1988 SPA to indicate that the original drafters of the 1988 SPA contemplated adoption by third parties. While not specifically addressing contract adoption, however, the 1988 SPA contains a provision that explicitly rejects third party beneficiaries. In relevant part, the SPA states "this Agreement is for the sole benefit of the parties hereto and nothing herein expressed or implied shall give or be construed to give any person or entity, other than the parties hereto, any legal or equitable rights hereunder." 1988 SPA, p. 70. That provision sheds light on the intent of the drafters, unequivocally stating that the agreement is for the "sole benefit of the parties hereto," not a third party. Accordingly, Appellant failed to create a genuine issue of material fact with regard to Appellee's potential contract adoption of the 1988 SPA. Moreover, the Court cannot find that Appellant established an intent of the drafters of the Pre-1971 Policies and the Appellant Policies to allow for third party adoption without these contracts.

Next, Appellant argued that Debtors were privy to the 1988 SPA and shared insurance contracts through the doctrine of equitable estoppel. When a party enjoys the benefits of a contract, it can become bound by the contract's terms and obligations. See E.I. DuPont de Nemours and Co. v. Rhone Poulenc Fiber and Resin Intermediates, 269 F.3d 187, 199 (3d Cir. 2001). This prevents parties from embracing certain portions of

the contract, while turning their backs on more distasteful clauses in the agreement. Id. at 200. As the Fourth Circuit explained, a party may be estopped from asserting that his lack of signature on a written contract precludes enforcement a contractual provision when he had consistently maintained that other provisions of the contract should be enforced to benefit him. See id. (citing Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH, 206 F.3d. 411, 418 (4th Cir. 2000)). Courts refer to a non-signatory's behavior during the life of the contract to determine if the third party embraced a contract until the prospect of litigation caused the same party to repudiate the agreement. Id. In order to invoke estoppel, the non-signatory must have embraced a direct benefit of the contract, rather than an indirect benefit. Id.; See also Thomason-CSF, S.A. v. American Arbitration Ass'n, 64 F.3d 773, 779 (2d Cir. 1995) (denying invocation of estoppel against a party who only indirectly benefited from the agreement). A direct benefit is a benefit that derives from the party asserting a term of the contract, rather than a benefit a third party will receive when another party acts in accordance with the contract. See Thomason-CSF, S.A., 64 F.3d at 779.

 Appellant argues that because Debtors requested and accepted monies produced by the 1988 SPA, Pre-1971 Policies, and Appellant Policies, they are equitably estopped from avoiding liability under the implied covenant of good faith and fair dealing. The implied warranty of good faith and fair dealing exists in every contract. See Dunlap v. State Farm Fire & Cas. Co., 878 A.2d 434, 440 (Del. 2005). The term, "good faith," however, has no set meaning, and instead prevents a wide range of forms of bad faith. Id. The implied covenant of good faith and fair dealing requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct, which could preclude the other party from enjoying the benefit of the original bargain. Id.

 The implied covenant of good faith and fair dealing has its limitations. Id. The covenant cannot be used to circumvent the parties' original bargain or create "a free floating duty . . . unattached to the underlying legal document." See id. at 441. Only when it is clear from the contract that the parties would have agreed to proscribe the act later complained of, had they thought to negotiate it, may a party invoke the protections of the covenant. Id. at 442. The covenant is not a catch-all to prevent any injustice, and Delaware courts have described invoking the covenant as a "cautious enterprise." See Nemec v. Shrader, 991 A.2d 1120, 1123 (Del. 2010). The implied covenant of good faith

and fair dealing cannot be applied to provide contractual protections that were not secured at the bargaining table. See Windshall v. Viacom Intern., Inc., 76 A.3d 808, 816 (Del. 2013).

Appellant's claims for breach of the implied covenant of good faith and fair dealing cannot be sustained. Regarding the 1988 SPA, there is no privity of contract and the equitable estoppel argument in attempt to forge privity between the parties through the shared insurance policies lacks specific proof in the record. Regarding the settlement contracts provided in conjunction with four instances of alleged overbilling and a general allegation that there were more occurrences, Appellant has not attached its claim of breach to an actual contract; in no instance of the shared settlement contracts has Appellant shown inappropriate billing by Debtors. Rather, Appellant cited four instances of alleged overbilling as examples of a larger course of conduct, and asked the court to assume this course of conduct implicated one of the settlement contracts that had capacity for privity. Again, the covenant of good faith and fair dealing is not a catch-all that can be used to prevent any injustice. See Nemec, 991 A.2d at 1123. Rather, the covenant of good faith and fair dealing ensures that arbitrary conduct does not deprive the parties of the original benefit of their bargain. See Dunlap, 878 A.2d at 440. Appellant has not established that, as to a particular settlement contract, it was precluded from enjoying the original benefit of its bargain.

Next, the Bankruptcy Court dismissed Appellant's claim for "tort" because of the lack of specificity in the claim. See In Re Federal-Mogul Global, Inc., 438 B.R. at 788. On appeal, Appellant is more specific, alleging that it has a claim against FMP for the tort of conversion or waste, for misusing assets of an implied trust, or for destruction of a shared asset. However, this specificity is nowhere to be found in Appellant's amended claims. The Bankruptcy Court appropriately dismissed the generalized tort claim, and Appellant is foreclosed from bringing claims here that were not originally pled. Further, when a claim in tort arises out of the same facts that amount to a breach of contract, the claim must be brought in contract, rather than in tort. Kuroda v. SPJJ Holdings, 971 A.2d 872, 890 (Del. Ch. 2009) (citing Data Management Int'l, Inc. v. Saraga, No. 05C-05-108, 2007 WL 2142848 (Sup. Ct. Del. Jul. 25, 2007)). To bring a tort claim along with a contract claim, the tortfeasor must have violated an independent legal duty apart from that imposed by contract. Id. Appellant has not made such a showing here.

12

## Conclusion

In conclusion, this Court affirms the decision of the Bankruptcy Court that Appellant failed to establish a right to pursue any claim against Debtors FMP/FMC. Summary judgment was granted appropriately.

IT IS ORDERED that the decision of the Bankruptcy Court is hereby <u>AFFIRMED</u>.


Dated: February 5, 2015                     /s/ Joseph H. Rodriguez
                                                                JOSEPH H. RODRIGUEZ
                                                                   U.S.D.J.